UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

In re                          )
                               )
KATHY L. COLE,                 )        Case No. 8:04-bk-10201-KRM
                               )
        Debtor.                )
_____ )

KATHY L. COLE,                 )
                               )
      Plaintiff,               )
                               )
vs.                            )        Adversary No. 04-00361
                               )
UNITED STATES OF AMERICA,      )
INTERNAL REVENUE SERVICE,      )
                               )
        Defendant.             )
_____ )


MEMORANDUM OPINION ON
DISCHARGEABILITY OF DEBTOR'S TAX
OBLIGATIONS FOR THE YEARS 1992 AND 1993

The Bankruptcy Code permits a debtor to discharge income taxes in Chapter 7 for a period which is at least three years before the bankruptcy filing, if the applicable returns were filed at least two years before the bankruptcy case, the returns are not fraudulent, and the debtor has not willfully attempted, in any manner, to evade or defeat the otherwise dischargeable taxes.  11 U.S.C. § 523(a)(1)(C).

In this case, the debtor is an accountant who prepared tax returns for a living.  Her electronic tax filing

service filed fraudulent tax returns for some of its clients in 1992 and 1993. She was indicted and pleaded guilty to one count of tax fraud.

What brings this matter before this Court is that the debtor did not pay her own income taxes for 1992 and 1993, and for 1996 through 1998. She now seeks to discharge all of these tax obligations.[1] For the reasons set forth below, the Court concludes that the debtor willfully attempted to evade or defeat the 1992 and 1993 income taxes, which are therefore excepted from the discharge.[2]

### BACKGROUND

In 1992, the debtor and a business partner formed Tamptax, Inc. ("Tamptax"), to prepare and file electronic tax returns for its clients.[3] The debtor also operated a separate accounting practice.[4]

---

[1] The Court has jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I). This Opinion constitutes the findings of fact and conclusions of law required to be made pursuant to Federal Rule of Bankruptcy Procedure 7052.

[2] By the time of trial, the United States had conceded that the outstanding taxes for three years, 1996-1998, are dischargeable. Thus, the trial focused only on the 1992 and 1993 income taxes and related statutory additions.

[3] Tamptax was a Schedule C corporation, in which the debtor was a 50% shareholder and a director.

[4] The debtor, formerly known as Kathy L. Mouling, earned a bachelor's degree in accounting from the University of South Florida in 1980. Later, she took over her father's accounting practice.

On April 9, 1998, the debtor was indicted for tax fraud; on November 10, 1998, she pleaded guilty to one count of making a fraudulent claim to the I.R.S. with respect to a Tamptax client's 1993 return.  She served three years' probation, three months' home detention, and paid a $2,000 fine.

The debtor filed her tax returns for 1992 and 1993 after they were due.  These returns were inaccurate and underreported her income.  As a result, on June 1, 1999, the debtor entered into a stipulation with the government assessing income taxes and statutory penalties of $9,508.00 and $7,131.00, respectively, for 1992, and $16,693.00 and $12,494.00, respectively, for 1993.[5]

**Tax Year 1992**

In 1992, the debtor derived taxable income from her accounting practice and from Tamptax.  Periodically, the plaintiff deposited funds received from Tamptax into her personal checking account or into a savings account in the name of her minor child.  The debtor also deposited income from her accounting practice into both of these accounts.  The debtor also deposited other funds into these accounts which she asserts were not taxable:  child support payments, widow's

---

[5] The penalties were assessed under I.R.C. Section 6663.  By the petition date, these taxes plus penalties and interest had grown to a total of $40,560.48 for 1992 and $71,066.08 for 1993.

3

pension payments, monies received from various family members and clients, and \$12,352.93 from State Farm Insurance Company's payments on a claim arising from burglaries of Tamptax's equipment.[6]

The debtor did not file her 1992 tax return until August 23, 1992, eight days after the extension deadline. In preparing the return, the debtor employed a "bank account deposits" method by which she totaled her bank deposits and then deducted the deposits which she maintains were not taxable income (e.g., the child support payments, widow's pension payments, funds held for family members, and the insurance proceeds). The resulting sum was reported as gross receipts on Schedule C for the debtor's accounting practice.

The debtor did not report any wages or salary from Tamptax on her return. She reported total income (Line 23) of only \$16,337 even though her bank deposits, net of the asserted "non-taxable" items, totaled \$55,281.[7] She then declared \$2,366 of taxes due. The income reported was about \$5,000 less than the amount of funds she actually received (and deposited) from her accounting practice and from Tamptax.

---

[6]   These insurance proceeds were payable to Tamptax on a policy it maintained.   The proceeds were paid by the insurer to compensate the corporation for the burglaries.

[7]   The debtor reported \$55,281 of bank deposits on Schedule C as "gross receipts" from her business -- "Kathy L. Mouling, Accountant." She then deducted \$38,034 of "business expenses" to arrive at "net profit" of \$16,319 shown on Line 12 of her 1992 return.

4

**Tax Year 1993**

The debtor did not file her 1993 tax return until April 5, 1996, nearly two years after the return was due. The debtor argues that the late filing is excusable because the government seized her records in the Tamptax criminal investigation, sometime in May or June of 1994;[8] but, the tax filing deadline had already passed when the records were taken.

The debtor used the same "bank account deposits" method and reported no wages, salary or dividends from Tamptax. Funds received from Tamptax were again included in the "gross receipts" from her accounting practice on Schedule C. She included deposits of $55,044 as gross receipts in Schedule C for "Kathy L. Mouling." She then deducted "business expenses" of $11,357, to arrive at "net profit" of $43,697. As a result, even though her records reveal total bank deposits, net of the asserted non-taxable items, of about $60,244, the debtor reported only $43,832 of total income.[9]

---

[8] The records were returned in the first half of 1995.

[9] The return that the debtor actually filed was not available at trial because it had been destroyed by the I.R.S. The I.R.S. routinely generates a computer summary, or transcript, when a return is filed. In this case, the I.R.S. produced at trial a transcript for the debtor's 1993 taxes, showing only $18,609 of adjusted gross income. The debtor testified that she had prepared several versions of her 1993 tax return. The one she produced at trial shows reported income of $55,054. If, as the Government contends, the 1993 return produced by the debtor was not the same as the one actually filed, then the computer transcript for the 1993 return

## DISCUSSION

Taxes for a period that is more than three years before the bankruptcy filing, and which might otherwise be dischargeable, cannot be discharged if the debtor willfully attempted, in any manner, to evade or defeat the taxes. 11 U.S.C. § 523(a)(1)(C). "Willful evasion" requires proof of (1) specific conduct and (2) a mental state of willfulness. *Griffith v. United States (In re Griffith)*, 206 F.3d 1389, 1396 (11th Cir. 2000).[10]

A debtor's conduct is "willful" if it is done voluntarily, consciously or knowingly, and intentionally. *Fretz v. United States*, 244 F.3d 1323, 1330 (11th Cir. 2001). The government is required to prove that the debtor (a) had a duty to file returns and pay taxes; (b) knew she had such a duty; and (c) voluntarily and intentionally violated that duty. *Id.* Proof of intentional omissions may be sufficient, just as proof of affirmative acts, to support a finding of willful evasion. *Id.* In *Fretz*, the debtor's intentional

---

suggests that she may have reported as much as $20,000 less than the amount she determined was taxable under her own bank account analysis.

[10] The United States bears the burden of proof to show by a preponderance of the evidence that the taxes are non-dischargeable under 11 U.S.C. § 523(a)(1)(C). *Grogan v. Garner*, 498 U.S. 279, 287-88 (1991).

failure to file tax returns and pay the taxes for ten years was held to be sufficient to render all of the taxes non-dischargeable.

In deciding this case, the Court is mindful of the prevailing view that Section 523(a)(1)(C) should be applied in such way as to best promote the purpose of granting a discharge to the honest, but unfortunate debtor. *See In re Birkenstock*, 87 F.3d 947, 951 (7th Cir. 1996). Thus, the late filing of returns due to "mistake, inadvertence or an honest misunderstanding" would not, without more, constitute evasion of the tax. *In re Fretz*, 244 F.3d at 1330. Understating income, by itself, does not establish willful evasion. *Burgess v. United States (In re Burgess)*, 199 B.R. 201, 207 (N.D. Ala. 1996). A debtor's failure to pay taxes, without some other indication of willfulness, is not sufficient to except the taxes from the discharge. *In re Haas*, 48 F.3d 1153 (11th Cir. 1995).

"Willfulness" may be found where there exist certain fact patterns, known as "badges of fraud," or other circumstantial evidence indicating that the debtor intended to evade tax obligations. *See In re Birkenstock*, 87 F.3d at 951; *In re Zuhone*, 88 F.3d 469, 473 (7th Cir. 1996); *Berzon v. United States (In re Berzon)*, 145 B.R. 247, 250 (N.D. Ill. 1997).

7

Examples of conduct found to be sufficient for a finding of willful tax evasion include:   transfers of assets to family members for insufficient consideration for the purpose of limiting the ability of the I.R.S. to collect, *In re Griffith*, *supra;* acts preventing I.R.S. agents from lawfully entering the taxpayer's premises, *In re Gillis*, 251 B.R. 920 (Bankr. S.D. Ga. 2000); the combination of unexcused late-filed returns and significant understatement of income, *In re Berzon*, *supra*.   The understatement of income for more than one tax year, implausible or inconsistent explanations of behavior, inadequate records, or transfer of assets to a family member may support the necessary inference of willfulness.   *See In re Greene*, 207 B.R. 21, 24-25 (M.D. Fla. 1997).

## Specific Conduct

The debtor in this case did much more than file tax returns late.  The returns for 1992 and 1993 were inaccurate and materially understated her real taxable income.  The debtor did not report as wages, salary or dividends the monies she received for her services at Tamptax.  Instead, she lumped the amount of bank deposits which she selected as "taxable"

into the gross receipts from her separate accounting practice, against which she deducted the expenses of that business.[11]

The debtor did not even include in her reported bank deposit totals all of the deposits that she actually made into her savings account in 1992. She did not include as income her deposits of the insurance monies which were paid by the insurer on a claim by made Tamptax under its business policy.[12]

## Willfulness

There is no doubt that the debtor's underreporting of income was willful. She is an accountant who prepares tax returns for a living. She was aware of her duty to accurately report her income and timely file tax returns.

The debtor claims that she was justified in preparing her tax returns from bank deposits. The use of this indirect method, however, is suspect in light of the debtor's sophisticated knowledge of accounting procedures and tax laws. By electing not to utilize customary and verifiable documentation, such as W-2 or 1099 forms for the monies received from Tamptax, the debtor could conceal a portion of her taxable income.

---

[11] There was no legal justification offered by the debtor for treating the monies she received from Tamptax as gross receipts of her accounting practice.

[12] While such payments might not be taxable when paid to the owner of the policy who makes the claim, there is no legal basis for excluding such payments from income when they are distributed to a shareholder of the claimant.

In fact, the debtor did not directly report any monies received from Tamptax as wages or compensation even though she had prepared corporate tax returns for Tamptax for 1992 and 1993, showing payment of officer compensation to her. She did not report as income the payments made on Tamptax's insurance claim and she did not report as income all of her bank deposits from Tamptax and the accounting practice.

When the debtor applied for a credit card in 1993, she advised the bank that she had an annual salary from Tamptax of $36,480. She even gave the bank a "dummy" W-2 form showing that she earned "wages" from Tamptax totaling $35,684 in 1992. The debtor had never filed any Tamptax W-2 forms with the I.R.S. and she elected not to report any such wages from Tamptax on her 1992 or 1993 returns.

The Court is compelled to conclude from this particular conduct -- the preparation and use of wage-verifying documents to get a credit card, while omitting such wages from her tax returns -- that the debtor acted deliberately and intentionally to understate her income. Looking at the totality of the circumstances, there is no doubt that the plaintiff evaded her tax obligations for 1992 and 1993.

## Allocation of Payment to I.R.S. During Chapter 7 Case

The debtor filed a motion in the Chapter 7 case seeking approval of a sale of fully-encumbered real property that the trustee likely would have abandoned. The proceeds were paid to lien holders, including the I.R.S. which received $44,304.32. The check to the I.R.S. did not designate how the payment was to be applied. The debtor now seeks a ruling that this payment must be applied to reduce the 1992 and 1993 tax obligations.

In cases where there is no designation as to how a taxpayer's payment is to be applied, or if the tax payments are made "involuntarily," the I.R.S. may allocate payment "in a manner serving the best interests of the I.R.S." *In re Tecson*, 291 B.R. 199, 200 (M.D. Fla. 2003).

An undesignated payment is one as to which the taxpayer has given no direction as to how the funds are to be applied. *Id.* A tax payment is "involuntary" if it is "received by . . . the United States as a result of distraint or levy or from a legal proceeding in which the Government is seeking to collect its delinquent taxes or file a claim therefor." *Id.* at 201 (citing *Amos v. Comm'r*, 47 T.C. 65, 69 (1966)). When a payment is involuntary the Government is free to allocate the payment as it chooses. *In re A & B Heating & Air Conditioning*, 823 F.2d 462, 463 (11th Cir. 1987).

Examples of payments deemed to be "involuntary" include: *Harker v. United States*, 357 F.3d 846 (8th Cir. 2004) (payment from the sale of property secured by a federal tax lien during a Chapter 7 bankruptcy); *United States v. Pepperman*, 976 F.2d 123, 127 (3rd Cir. 1992) (payment to the I.R.S. from a Chapter 7 estate is "involuntary"); *In re Villanueva*, 291 B.R. 199, 200 (Bankr. M.D. Fla. 2003) (restitution payments, stemming from a tax fraud conviction, were "involuntary"); and *In re R.L. Inge Development Corp.*, 78 B.R. 793 (E.D. Va. 1987) (payments by a Chapter 7 debtor pursuant to a bankruptcy court order directing that certain property be sold and proceeds applied to claims of lienholders).

The I.R.S. filed a secured claim in this case in the amount of $168,516.26. The $44,304 payment was made pursuant to a court order in a judicial proceeding in which the Government had filed a claim to collect the taxes that were due. No written designation accompanied the payment and none appears on the payment check. Therefore, the payment of $44,304 to the United States was involuntary and the I.R.S. is free to allocate the payment as it deems appropriate. The I.R.S. will not be required to apply the $44,304 payment to the non-dischargeble 1992 and 1993 tax obligations.

12

## CONCLUSION

The Government has proven that the debtor willfully evaded her tax obligations for 1992 and 1993. The debtor filed her tax returns late, maintained inconsistent records, and materially underreported her income for two consecutive years. The totality of the circumstantial evidence compels the finding that such conduct was intentional and willful. Therefore, the debtor's 1992 and 1993 tax obligations are excepted from discharge by 11 U.S.C. § 523(a)(1)(C). Further, these tax obligations are not required to be reduced by the $44,304 payment to the Government from the asset sale in the Chapter 7 case. The Court will enter a separate judgment consistent with this opinion.

DONE and ORDERED at Tampa, Florida, this 5th day of August, 2005.

K. RODNEY MAY
United States Bankruptcy Judge

Copies Furnished To:

Kathy L. Cole, Debtor, P.O. Box 1728 Tampa, FL 33601

Buddy D. Ford, Esquire, Attorney for Debtor, 115 N. MacDill Avenue, Tampa, Florida  33609

Mary Apostolakos Hervey, Esquire, Trial Attorney, Tax Division, U. S. Department of Justice, Post Office Box 14198, Ben Franklin Station, Washington, D.C.  20044